**E. E. ELMER, d/b/a Mississippi Testing Laboratories**

**v.**

**UNITED STATES FIDELITY & GUARANTY CO.**

**Civ. No. 2800.**

United States District Court
S. D. Mississippi,
Jackson Division.

June 12, 1959.

Vardaman S. Dunn, Jackson, Miss., for plaintiff.

J. A. Covington, Jr., Meridian, Miss., for defendant.

BENJAMIN C. DAWKINS, Sr., District Judge.

All facts in this case were stipulated.[1]

It appears from the stipulations (No. 3) that Tyler-Hyde Construction Company (called Tyler-Hyde) was the prime contractor with United States for furnishing the materials and doing the work

1. "The Plaintiff, E. E. Elmer d/b/a Mississippi Testing Laboratories, through his attorney, and the Defendant, United States Fidelity & Guaranty Company, through its attorney, do hereby stipulate and agree that the facts herein set forth are correct and that judgment may be entered upon the facts stipulated, viz.:

"1. That on all occasions herein mentioned Plaintiff was the owner of the business known as Mississippi Testing Laboratories; that Carl John Olander was Plaintiff's Chief Inspector.

covered by that contract, to secure which the bond of defendant, United States Fidelity & Guaranty Company, now sued upon, was given.

"2. That Mississippi Testing Laboratories conducts the business of analytical chemists and maintains testing laboratories and the business includes testing and gradation control in connection with the operation of asphalt to meet required specifications.

"3. That Acme Asphalt Paving Company, in charge of Mr. Bruce Byrd, was engaged in the production and laying of asphalt paving for the Key Field Project at Meridian, Mississippi, under contract between Tyler-Hyde Construction Company, prime contractor, and the United States of America, Contract No. DA–01–076–Eng.–3766. That Tyler-Hyde contracted a large portion of the prime contract to T. F. Scholes, Inc., including all grading and asphalt paving and other items except concrete paving, which concrete paving was contracted by Tyler-Hyde to a Company other than T. F. Scholes. That T. F. Scholes, Inc. sublet the asphalt paving work to Acme Asphalt Paving Company.

"4. That Carl John Olander, as a representative of Mississippi Testing Laboratories, was contacted by Mr. Bruce Byrd of Acme Asphalt Paving Company and notified that Acme desired to contract with Mississippi Testing Laboratories to supervise the asphalt plant supplying the Key Field Project and to maintain gradation control so as to meet the contract specifications. That Carl John Olander, with affiant's authority, proceeded to the plant site, located near the Key Field Project, and found that the asphalt plant was shut down because of difficulty with the mixture of materials and inability to meet specifications.

"5. That on said occasion and on or about February 7, 1958, a contract was made orally with Acme Asphalt Company for all necessary supervision and testing work necessary to put the asphaltic materials together in correct proportions and to maintain gradation control, so as to meet the contract specifications and requirements for asphalt mix for use in paving on the Key Field Project. The terms of the contract were that Mississippi Testing Laboratories would receive $5.00 per hour and 7¢ per mile for the services of a Chief Inspector, and $3.50 per hour and 7¢ per mile with a 10-hour minimum guarantee for an Inspector to be left on the job during the paving operation and so long as was neces-

" * * * Tyler-Hyde sub-contracted a large portion of the prime contract to T. F. Scholes, Inc. (called Scholes) including all grading and asphalt paving

sary and Mississippi Testing Laboratories was given a telegraphic work order to commence work under the contract on February 8, 1958.

"6. That Mississippi Testing Laboratories accepted the contract and commenced work under said contract on or about February 8, 1958, and statements showing hours consumed and mileage at the agreed rates for the months of February, March, April and May are filed herein and attached to the Affidavit of Carl John Olander. That said statements correctly and accurately reflect the number of hours consumed and the mileage in accordance with said contract for the work involved and that the charges therefore are the reasonable and customary charges for such work.

"7. That the said work of Mississippi Testing Laboratories was concluded in May of 1958, at a price of $1,966.61, as reflected by the said statements and Mississippi Testing Laboratories has not been paid therefor, in whole or in part.

"8. That generally the work under said contract with Mississippi Testing Laboratories consisted of the services of Carl John Olander as Chief Inspector and the services of John Drusch, Inspector for Mississippi Testing Laboratories, who proceeded, with plaintiff's authority, to carry out and perform the contract and to supervise the plant and materials and to maintain gradation control at the asphalt plant, so as to meet the specifications. That said work was performed at the job site and during the course of performance representatives of the prime contractor, Tyler-Hyde Construction Company, made frequent visits to the job site and observed the progress and observed the testing and gradation control work of plaintiff and said inspector. The United States Engineers had set up a testing laboratory at the job site and plaintiff used this laboratory and assisted the engineers. As the work proceeded and charges under the contract accrued, the Mississippi Testing Laboratories sent copies of the statements showing work performed to Tyler-Hyde Construction Company, with requests for payment. Statements for work performed for February, March and April were transmitted to Tyler-Hyde Construction Company in May 1958 and the final statement was transmitted to Tyler Hyde Construction Company in July

* * * except concrete paving which * * * was contracted by Tyler-Hyde to a Company other than * * * Scholes"; and Scholes "sub-let the asphalt paving * * * to Acme Asphalt Paving Company (called Acme)." It is also stated in the same stipulation that Acme "was engaged in the production and laying of asphalt paving for * * * Key Field, under the contract between the United States and Tyler-Hyde", in which the bond sued upon was given. Although the last quoted statement appears first in stipulation No. 3, I think it must be assumed that all work done by Acme and Laboratories was under the subcontract from Scholes to Acme.

Mississippi Testing Labatores (called Laboratories,) was contacted by Acme "and notified that Acme * * * desired to contract * * * with Laboratories *to supervise the asphalt plant supplying the Key Field project and to maintain gradation control * * * to meet the contract specifications*"; that a representative of Laboratories (Carl John Olander) "* * * with affiant's authority (name of affiant not given) found, on investigation, the plant of Acme near the Key Field project, shut down because of difficulty with the mixture of materials and inability to meet specifications". That on this occasion "about February 7, 1958" an "oral contract was made with Acme", undoubtedly with Laboratories, for the latter "to furnish * * * all necessary supervision and testing work necessary to put the asphaltic materials together in correct proportions and to maintain grada-

tion control, so as to meet the contract specifications and requirements for asphalt mix for use in paving on the Key Field project." Prices to be paid Laboratories for this service, were $5 per hour and 7¢ per mile (presumably for use of automobile) for "a Chief Inspector, and $3.50 per hour and 7¢ per mile with a 10-hour minimum guarantee for an inspector to be left on the job during the paving operation * * *" and "* * Laboratories was given * * * work order to commence work under the contract of February 8, 1958." Work was begun accordingly, and correct statement of hours and mileage kept, for the months of February, March, April and May, as agreed, which were filed in the record of this case, attached to affidavit of Carl John Olander.

The work performed by Laboratories was finished in May 1958, for which it demanded, under its contract with Acme $1,966.61, no part of which has been paid, and to recover which this suit was filed.

The manner in which the contract was carried out, and the persons performing it are set forth in Paragraph 8 of the stipulations. (Footnote No. 1). Reference is also made to the last three stipulations, 9, 10, and 11, to illustrate the circumstance surrounding performance of the work by Plaintiff.

The legal question to be answered is: Do the facts, especially the contractual relations of plaintiff with the subject matter of the contract between the United States and prime contractor, Tyler-Hyde, above set forth meet the re-

1958, with requests for payment, and on July 22, 1958, final demand was made on Tyler-Hyde Construction Company by registered letter.

"9. That the prime contractor, Tyler-Hyde Construction Company, through its supervisory representatives knew of the contract for gradation supervision and control and knew that Mississippi Testing Laboratories was expecting to be paid for same.

"10. That the prime contract was in the total amount of $1,645,270.85; that Tyler-Hyde Construction Company, General Contractor, as Principal, and Defend-

ant, United States Fidelity & Guaranty Company, as Surety, executed and furnished the performance and payment bonds required by law on Federal projects and as required by 40 U.S.C.A. 270 (a) et seq.

"11. That this stipulation is entered in lieu of affidavits and counter-affidavits heretofore filed in connection with Plaintiff's motion for summary judgment and said affidavits and counter-affidavits are to be disregarded and both parties, Plaintiff and Defendant, rest upon this stipulation."

quirements of the Miller Act,[2] as interpreted by the Supreme Court in MacEvoy Co. v. United States for Use and Benefit of Calvin Tomkins Co., 1944, 322 U.S. 102, 64 S.Ct. 890, 892, 88 L.Ed. 1163, or is it afflicted with the same infirmities found in that case?

We should not forget it is the Bond Company's liability which is involved. Regardless of what may be thought of the logic of the case, it remains the law, except for variations in two or three decisions in lower courts. True, plaintiff's work was performed on the scene and to the knowledge of all concerned, but does this, of itself increase the liability, under the limitations of the Miller Act, as interpreted in the MacEvoy case?

Here, the prime contractor was Tyler-Hyde, the sub-contractor was Scholes; Scholes, in turn, sub-contracted the asphalt paving to Acme, and the latter, contracted with Laboratories to perform work as stated in the stipulations.

In the MacEvoy case, supra, 1944, the United States contracted with MacEvoy to furnish materials and perform the work necessary to construct a housing project, on a cost plus basis, also under the Miller Act; MacEvoy purchased materials used in the work from Miller & Company, and Miller in turn purchased them from Tomkins, but failed to pay a balance due of $12,033.49.

Justice Murphy as the organ of the Court, stated there was no allegation that Miller, who occupied the position of Acme, or at least no better than Scholes, "agreed to perform or did perform any part of the work on the construction project." Nor was it disputed that "MacEvoy paid Miller in full for the material", which evidently was done here as to both Scholes and Acme. Tomkins gave the required notice and demand for payment to MacEvoy and its surety, without results, and then filed suit, which the District Court dismissed as not stating a cause of action under the facts alleged in that case. The Court of Appeals reversed 3 Cir., 137 F.2d 565, but the Supreme Court reinstated the judgment of the trial court. In doing so, it was said:

"Specifically the issue is whether under the Miller Act a person supplying materials to a materialman of a Government contractor and to whom an unpaid balance is due from the materialman can recover on the payment bond executed by the contractor. We hold that he cannot." [322 U.S. 102, 64 S.Ct. 892.]

The court then pointed out that under the Heard Act,[3] which preceded the Miller Act, it had been held payment bonds were given for the benefit of *"all persons"* (emphasis added) supplying him (the contractor) with labor or materials in the prosecution of such work, the courts "consistently applied a liberal construction to that statute," holding it was clearly "the intention of Congress to protect those whose labor and material has contributed to the prosecution of the work", citing several cases; and that this included not only " 'all persons supplying * * * labor and materials' * * * directly to the prime contractor, but also covered those who contributed labor and materials to sub-contractors." This was followed by a statement that, while the Miller Act *"repealed the Heard Act"*, it *"reinstated its basic provisions and was designed primarily to eliminate certain procedural limitations on its beneficiaries. There was no expressed purpose * * * to restrict in any way the coverage* of the Heard Act; the intent rather was to remove procedural difficulties * * * and thereby make it easier for* unpaid creditors to realize the benefits of the bond."

In spite of such comment, Justice Murphy proceeded: "A proviso then states:

" 'Provided, however, That any person having *direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon said*

---

2. "40 U.S.C.A. 270(a)".

3. (August 13, 1894, 28 Stat. 278).

*payment bond upon* giving written notice *to said contractor* within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made \* \* \*' " (Emphasis added.)

Justice Murphy again repeated the Miller Act was "entitled to a liberal construction \* \* \* to *protect those whose labor and materials go into public projects"*, yet added: *"But such a salutory policy does not justify ignoring plain words of limitation and imposing wholesale liability on payment bonds. Ostensibly the payment bond is for the protection of 'all persons supplying labor and material in the prosecution of the work' and 'every person who has furnished labor or material in the prosecution of the work' is given the right to sue on such payment bond. Whether this statutory language is broad enough to include persons supplying material to materialmen as well as those in more remote relationship* we need not decide. Even if it did include such persons we *cannot disregard the limitations on liability which Congress intended to impose and did impose in the proviso of Section 2(a). However inclusive may be the general language of a statute, it 'will not be held to apply to a matter specifically dealt with in another part of the same enactment* \* \* \*. *Specific terms prevail over the general in the same or another statute which otherwise might be controlling.'* " Citing Ginsberg & Sons v. Popkin, 285 U.S. 204, 52 S.Ct. 322, 76 L.Ed. 704.

The court then proceeds to say that Section 2(a) *"had no counter-part in the Heard Act"*, although it had stated earlier in the decision the later statute *"was designed primarily to eliminate certain procedural limitations on its beneficiaries. There was no expressed purpose in the legislative history to restrict in any way the coverage of the Heard Act."* The opinion continued that the *proviso of Sec. 2(a) "makes clear that the right to bring suit on a payment bond is limited to (1) those materialmen, laborers and subcontractors who deal directly with the prime contractor and (2) those materialmen, laborers and subcontractors who, lacking express or implied contractual relationship with the prime contractor, have direct contractual relationship with a subcontractor and who give the statutory notice of their claims to the prime contractor. To allow those in more remote relationships to recover on the bond would be contrary to the clear language of the proviso and to the expressed will of the framers of the Act.* Moreover, it would lead to the absurd result of requiring notice from persons in direct contractual relationship with the subcontractor, but not from more remote claimants."

Of course, in the MacEvoy case, it was found that Tomkins not only had no direct dealings with either the prime or the sub-contractor, but furnished materials to a materialman, and the opinion states he did not work on the job, while in the present case, Elmer, the plaintiff, under contract with Acme, whose contract was with Scholes, who was a subcontractor to Tyler-Hyde, went upon the premises and rendered, apparently, valuable and satisfactory services, to the knowledge of all concerned. However, if we accept the Supreme Court's statement in the MacEvoy case, that *the right to bring suit on a payment bond is limited to (1) "those* \* \* \* who deal directly with the prime contractor," and (2) those of the same classes, "who, lacking express or implied contractual relationship with the prime contractor, *have direct contractual relationships with a subcontractor,* and who give the statutory notice of their claims to the prime contractor", it is hard to see how plaintiff can sue upon the bond.

Finally, the Court, itself, supplied the meaning of "sub-contractor" in cases such as MacEvoy and here as follows:

"In a broad, generic sense a subcontractor includes anyone who has a contract to furnish labor or material to the prime contractor. In that sense Miller was a subcontrac-

tor. But under the more technical meaning, as established by usage in the building trades, *a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen.* To determine which meaning Congress attached to the word in the Miller Act, we must look to the Congressional history of the statute as well as to the practical considerations underlying the Act."

This court, therefore, feels bound by this interpretation, and plaintiff's demand must be rejected.